# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

TERRA HOLLIS, on behalf of her )
minor children TREY HOLLIS and )
BRITANIE HOLLIS, )
                     )
      Plaintiffs, )     **Case No. 1:09-0077**
                     )     **Judge Trauger**
**v.** )
                     )
CHAD ESTES and RYAN SOUTHERLAND, )
                     )
      Defendants. )

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 26), to which the plaintiffs have responded (Docket No. 41), and the defendants have filed a reply in support (Docket No. 47). The plaintiffs have filed a Motion to Strike (Docket No. 42), to which the defendants have responded (Docket No. 45). The defendants have also filed a Motion to Deem Certain Statements of Fact Admitted (Docket No. 49), to which the plaintiffs have responded (Docket No. 50). For the reasons discussed herein, the Motion for Summary Judgment will, for the most part, be denied, and the later two motions will be denied as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

The story of this case begins with a December 13, 2008 evening basketball game in Pulaski, Tennessee, between high school basketball rivals Giles County and Marshall County.[1]

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 41 and 48) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith*

Plaintiff Trey Hollis, who, at the time, was a seventeen-year-old high school junior, played small forward for Giles County. His sister, plaintiff Britanie Hollis, was a fourteen-year-old high school freshman at Giles County, and she watched the game from the stands. During the game, there was an altercation in the stands between students (not involving the plaintiffs) from the two rival schools.

Defendant Ryan Southerland worked for the Pulaski Police Department and was at the game, working as an on-duty "school resource officer." (Docket No. 41 Ex. 3 at 2.) The defendants claim that, after the game was over and the altercation appeared to have ended, Giles County basketball coach Billy Holt informed Southerland that the dispute might continue at a local McDonald's restaurant where students from both schools traditionally gathered after such games.[2] Indeed, after the game, Trey and Britanie Hollis separately went to the McDonald's

---

*Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2]The plaintiffs do not concede that this statement was made and have generally disputed, to varying degrees, the defendants' position that there was credible evidence to believe that a violent altercation or other gang activity would take place at the McDonald's. (*See e.g.* Docket No. 41 Ex. 3 at 2-3.) The defendants filed the Motion to Deem Certain Statements of Fact Admitted (Docket No. 49), arguing that, while the plaintiffs maintain that a myriad of facts are disputed, the plaintiffs fail to point to record evidence actually refuting the statement of fact or, in their response, the plaintiffs do not actually dispute the fact but "attempt to muddy the waters" by pointing to some other issue that is not directly responsive to the statement of fact. (Docket No. 49 at 2.) The court will point out where there is a relevant disagreement on an issue of fact. However, because a video documented many of the key events and other key facts are undisputed, the court's task in determining what actually happened at the key moments is simplified. The Motion to Deem will be denied as moot, because the undisputed facts and video show that a reasonable jury could find that the defendants violated the plaintiffs' constitutional rights. Where, as here, the parties deviate from the standard practice of (1) stating a material fact (2) responding to it and (3) stepping back and allowing the court to evaluate the record, the record becomes clogged with wasteful and unnecessary briefing, which is how the court would describe the Motion to Deem and the response thereto.

restaurant and arrived in time for the fight discussed below.

In response to receiving the information about a potential incident at the McDonald's, Southerland contacted his supervising officer, Justin Young, and requested assistance at the McDonald's. Southerland then drove to the McDonald's and parked in the restaurant's parking lot. Young and Pulaski police officer/defendant Chad Estes arrived and parked in an adjacent lot. It was readily apparent to the officers that more than 100 students were gathered inside the restaurant.

Shortly after arriving at the McDonald's parking lot, Southerland observed Brad White, whom Southerland recognized and believed to be in a gang in Pulaski, enter the restaurant. The defendants have also suggested that gang signals were flashed inside the restaurant.[3] The defendants maintain that, around this time, a 911 call was radioed reporting a fight at the McDonald's. There is no dispute that, inside the McDonald's, Brad White and William Reynolds (who was also from Giles County) got into an argument with two students from Marshall County, and a fight commenced at the far end of the restaurant's side lobby/sitting area, that is, away from the lobby door.

Fearing the skirmish might be gang-related, Southerland made his way to the side lobby door, and officer Estes attempted to enter through the back entrance of the restaurant. Estes found the door to be locked, and, when he knocked on the door, the students inside refused to open it. Indeed, someone (not one of the plaintiffs) yelled "police!," and students (including Trey Hollis) started flooding out of the side lobby door. As the students were leaving the

---

[3]It is undisputed that neither plaintiff was in a gang or wearing colors or making signals associated with gang activity. (Docket No. 48 at 3-4, 10.)

restaurant, officer Southerland entered the restaurant through the side lobby door.

As captured on the McDonald's security camera, Hollis and Southerland met in the doorway.[4] It is difficult to observe the first few seconds of the interaction because the footage is blurry. (Docket No. 40.) It is undisputed that, during these first moments, Officer Southerland, he maintains inadvertently, stepped "very hard" on Trey Hollis's foot and pushed Hollis back. (Docket No. 48 at 5-6.) Then, Hollis took two or three steps back, threw his hands straight up in the air, and said "dang." With his hands in the air, Hollis then tried to step through the doorway, continuing to move toward the exit.

Officer Estes was now at the same doorway, having come around from the locked back entrance. He claims that he viewed Hollis's, supposedly agitated, demeanor as potentially threatening, but he also recognizes that "it is possible that Trey Hollis was simply moving toward the exit," along with many others (approximately half of the crowd) who were trying to leave the restaurant as the police officers entered. (*Id.* at 6-7.) Estes also concedes that he had no training in "what constitutes a threatening gesture." (*Id.* at 7.)

At this point, the video becomes clearer. Over the next five or so seconds, officer Estes grabbed Hollis and forcefully pushed him back over a dining table. (Docket No. 40.) While Estes claims that "he attempted to take physical control of Trey Hollis by placing him against a wall," and, in doing so, "ran into a table, lost his balance, and fell onto Trey Hollis over the table," the video does not provide clear support for that version of events. (Docket No. 41 Ex. 3 at 11.) Rather, it simply appears as if Estes grabbed Hollis and, essentially, threw him down onto the

---

[4]None of the defendants knew any of the plaintiffs prior to the events of December 13, 2008.

table. (Docket No. 40.) Additionally, during this portion of the struggle, Estes and Southerland said "very ugly things" to Trey Hollis, calling him a "stupid "motherf—ker" and a "sonofabitch." (Docket No. 48 at 11.)

Britanie Hollis had been watching the "Brad White" fight and had decided to leave when she saw the police. After she grabbed her coat and was heading toward the side lobby door, she saw officer Southerland shoving her brother. At this point, Britanie Hollis began yelling at the police officers to get off of her brother. The defendants claim that, in addition to yelling, she started grabbing at Estes and trying to get between Southerland and Estes. During the five-second struggle, Southerland grabbed Britanie Hollis and strongly shoved/flung her out of the way before turning his attention back to Trey Hollis. (Docket No. 40.)

From the video, Britanie Hollis clearly loses her balance as a result, but she does not fall to the ground. (*Id.*) She is then restrained by another student. (*Id.*) It is undisputed that, "in addition to being hurt, upset and angry, Britanie Hollis was afraid and fearful when all this happened. She was embarrassed and upset to have this happen in public with so many people in her home town staring at her." (Docket No. 48 at 4.)

At the end of this portion of the confrontation, Estes took Trey Hollis by the jacket, pulled him off of the table, and, along with another officer on the scene, Pat Ingle, took him outside of the restaurant toward the police car. No further relevant events are captured on the surveillance camera.

At this point, the defendants claim that Hollis was "placed over a police vehicle" and was handcuffed. (Docket No. 41 Ex. 3 at 12.) The plaintiffs claim that Estes aggressively "slammed [Hollis] . . . head first down across the back" of the police car and aggressively handcuffed him.

(*Id.*; Docket No. 48 at 8.)   There is no dispute that, at least, Hollis's "head hit the back window."[5]  (Docket No. 34 at 6.)

After being handcuffed, Trey Hollis was directed to sit down on the curb in front of the patrol car, and he complied.  With a considerable crowd looking on, he remained there for 15-20 minutes while the officers on the scene cleared the remaining crowd.  Despite the fact that there were many fights and altercations at the restaurant and in the parking lot, no other students were detained or arrested by the police.  After the crowd was cleared, Trey Hollis was released without any citation being issued, and he was taken by family members to the emergency room.

There is no dispute that Trey Hollis suffered painful, swollen wrists because the handcuffs were too tight and a mild head injury from hitting the police car.  (Docket No. 48 at 10-11.)  While Estes concedes that he cannot recall what Trey Hollis said when the handcuffs were placed on him, the defendants still maintain that Hollis never informed the officers that the handcuffs were too tight; in his affidavit, Hollis claims that he repeatedly indicated that the handcuffs were too tight by saying things like "oww" and making other pain sounds as the handcuffs were applied.  (Docket No. 48 at 8-9; Docket No. 41 Ex. 6 at 2.)

The physical injuries sustained by Hollis, however, were not severe, and he was able to practice with his team on the following Monday and play in his team's next game on the

---

[5]The defendants maintain that they are not certain which officer was actually responsible for Hollis's head hitting the back window of the police car.  (Docket No. 34 at 20.)  In his deposition, Hollis stated that he assumed it was Estes because he was the one who "arrested" him and had control of him as they left the restaurant, but he could not say "with any certainty" that Estes was the one who caused him to hit his head on the window of the police car.  (Docket No. 27 Ex. 2 at 139.)  However, in his deposition, Estes stated that he was the officer who "forced [Hollis] up against Officer Southerland's patrol car and placed him into custody." (Docket No. 41 Ex. 8 at 86.)

following Tuesday with the aid of Tylenol. In addition to the wrist and head injuries, Trey Hollis "was embarrassed and upset" by the events. (Docket No. 48 at 10.) Indeed, both Trey and Britanie Hollis maintain that they still "hurt emotionally" from the events of December 13, 2008 and that seeing a police officer or going to McDonald's makes them "very upset and anxious." (*Id.* at 12.)

The Complaint in this case was filed on November 5, 2009 and was of a broader scope. That is, additional family members of the plaintiffs asserted claims and claims were asserted against additional defendants. (*See* Docket No. 1.) Through discovery and summary judgment briefing, claims and parties have fallen away. At present, plaintiffs Trey and Britanie Hollis (through their mother) assert a Section 1983 claim against Southerland and Estes in their individual capacities, claiming that the defendants used excessive force against them in violation of their Fourth Amendment rights, and Trey Hollis claims that he was subjected to an improper seizure, also in violation of his Fourth Amendment rights protected under Section 1983. (*See* Docket No. 41.) Additionally, the plaintiffs maintain a claim against these two defendants for intentional infliction of emotional distress (IIED) under Tennessee state law. (*Id.*) The defendants argue that, as to the Section 1983 claims, they are protected by the doctrine of qualified immunity and that the IIED claim is not supportable. (Docket No. 34.)

## <u>ANALYSIS</u>

## I.     **Motion to Strike**

The plaintiffs argue that, prior to ruling on the defendants' Motion for Summary Judgment, the court should strike the affidavit of Robert Allen, who is the defendants' "police practices" expert. (Docket No. 42.)

Allen works for the Metropolitan Nashville Police Department as a Firearms and Defensive Tactics supervisor and has "been an adjunct professor with Nashville Technical Institute instructing in defensive tactics and officer survival since 1994." (Docket No. 31 Ex. 1 at 1.) Allen submitted an affidavit and expert report concluding that the force used upon Trey and Britanie Hollis was "appropriate" under the circumstances and that the actions of Southerland and Estes were consistent with professional police training. (*Id.* at 3-4.) According to Allen's resume, he has been accepted as a police practices expert in cases in this District on at least seven occasions. (Docket No. 46 Ex. 1 at 5.)

In his expert report, Allen largely adopts the defendants' version of the relevant events (including that Estes lost his balance and that Britanie Hollis was merely "pushed" to one side). (Docket No. 31 Ex. 1 at 5.) He maintains that the individual uses of force were reasonable, given the "rapidly evolving" nature of the scene, and that each of the actions taken by the officers, including handcuffing Hollis and having him sit on the curb for 15-20 minutes, were consistent with recognized police practices. (*Id.* at 10-12.)

The plaintiffs argue that Allen's affidavit and report should be stricken because he is not an appropriate expert under *Daubert* or Fed. R. Civ. P. 702. (Docket No. 42 Ex. 1 at 1.) While the plaintiffs raise some valid concerns about Allen's report, including that he entirely adopts the "defendants' factual view of what happened," the credibility of the plaintiffs' argument is undermined by the fact that they operate under the assumption that "police practices" in an excessive force case is not an appropriate field for expert testimony. (*Id.* at 4-5.) As the defendants point out, the Sixth Circuit has recognized that police practices experts can aid the jury in excessive force cases. (Docket No. 45 at 5 citing *Champion v. Outlook Nashville, Inc.*,

380 F.3d 893, 908 (6th Cir. 2004)).

As discussed below, however, even giving credence to the points in Allen's affidavit and report, the defendants are not entitled to summary judgment. The court will deny the plaintiffs' Motion to Strike as moot, and, in advance of trial, the plaintiffs may file a proper motion *in limine*, seeking to exclude Allen from testifying at trial under the *Champion v. Outlook Nashville* standard, if they so choose.[6]

## II.     The Defendants' Motion for Summary Judgment

### A.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that

_____

[6]The plaintiffs also move for the court to not consider (or strike) portions of the affidavits that Southerland and Estes submitted in support of the defendants' summary judgment motion, arguing that the affidavits contain statements that were not based upon personal knowledge or contained hearsay or "other objectionable statements." (Docket No. 42 Ex. 1 at 5 citing Fed. R. Civ. P. 56(c)(4)). The personal knowledge objections challenge the defendants' "broad and anonymous use" of the word "we" at certain points in the affidavits when describing an individual officer's motivations. (*Id.* at 6.) The rest of the motion makes an assortment of objections, including that statements attributed to Coach Holt and Sergeant Young are hearsay and that the defendants' statements as to what they "believed," as opposed to what they "observed," are improper. (*Id.* at 6-7.) Even if the plaintiffs are technically correct on some points, few of these objections relate to the physical force applied to the plaintiffs, which is the core issue in this case. As can be seen below, this aspect of the Motion to Strike simply has no bearing on the ultimate outcome of the Motion for Summary Judgment and, therefore, will be denied as moot.

there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A.      **Basic Section 1983/Qualified Immunity Law**

To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, there is no dispute that Estes and Southerland were acting under color of state law. (Docket No. 34 at 11.)

The defendants claim that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.*" Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)**.** Generally, the qualified immunity inquiry

involves first, determining whether a constitutional or statutory violation occurred, and, if so, then determining if the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). However, courts should use their discretion and may consider the issue of whether the right was clearly established first, if such an analysis is appropriate "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

In qualified immunity analysis, government officials performing discretionary functions are entitled to "the benefit of the doubt." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once the defendant claims that qualified immunity applies, it is the plaintiff's burden to demonstrate that the doctrine should not apply – that is, to sufficiently show that a constitutional violation occurred and that the law at issue was "clearly established" by the relevant time period. *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

### B.      Excessive Force

Section 1983 claims of excessive force arise exclusively under the Fourth Amendment[7] and are evaluated under the standard of "objective reasonableness," that is, viewing the facts and circumstances from the perspective of a reasonable police officer on the scene, was the degree of force used objectively unreasonable. *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). Plainly, an officer has the right to use some degree of "physical coercion" to effect an arrest or to detain a suspect. *Id.* Indeed, it is well settled that "not every push or shove, even if it may later seem

---

[7]*Graham v. Connor*, 490 U.S. 386, 395 (1989).

unnecessary," violates the Fourth Amendment.  *Lee v. Ritter*, 2005 WL 3369616, *7 (E.D Tenn. Dec. 12, 2005)(internal citation omitted).

In evaluating whether the physical coercion used crossed over to the point of being excessive, the court should consider, among other things, (1) the severity of the crime at issue; (2) whether the suspect poses a threat to the safety of the officers or others; and (3) whether the suspect is actively evading arrest.  *Fox*, 489 F.3d at 236.  Ultimately, the "objective reasonableness" test involves a pure "totality of the circumstances" analysis.  *Id.* at 237.  With this standard in mind, the court will examine the conduct at issue here, noting that, under Sixth Circuit precedent, the individual actions of each officer and the individual uses of force should be considered separately.  *See Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004).

Consistent with this analysis, the defendants take each use of force against Trey Hollis (the table, the car, and the handcuffs) and the use of force against Britanie Hollis (the shove) and argue that none of these events involved the use of excessive force, and, therefore, the defendants are entitled to qualified immunity.  (*See* Docket No. 34 at 17.)

### i.       The table

In arguing that it was not excessive force to take Trey Hollis over the table, the defendants maintain that they arrived on a "mob scene" and intended to "deter violence."  (*Id.* at 18.)  Employing Allen's terminology, they argue that, using recognized police practices, Southerland, when he encountered Trey Hollis in the doorway, "checked" him; that is, applied light pressure to him to keep a safe distance.  (*Id.* at 18-19.)  Then Estes, acting as a "cover," or protecting officer, for Southerland, saw Trey Hollis's "threatening" conduct (raised arms, use of the word "dang") and responded by using "soft empty hands" to put Hollis up against a wall.

(*Id.* at 19.)  While "soft empty hands" is intended to be a "limited amount of force" with "less risk of injury than other techniques such as . . . a baton or asp," unfortunately, the defendants maintain, Estes lost his balance and took Hollis over the table.  (*Id.*)

The defendants also argue that, even if there is a disputed issue of fact about Estes's intent in taking Hollis over the table, the force used was *de minimis* and, therefore, not actionable.  (*Id.* at 19-20.)  The defendants rely heavily on *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000).  There, the Eleventh Circuit determined that an officer who arrived on the scene to break up a fight used *de minimis* force when he grabbed the plaintiff from behind (off of the other combatant), threw him against a van, kneed him in the back, pushed his head up against the van, searched his groin area, and handcuffed him.  *Id.* at 1254-55, 59.  Finally, the defendants argue that, even if the use of force here was actionable, "no cases establish that officer Estes's conduct was clearly violative of a constitutional right," and, therefore, he is entitled to qualified immunity on this aspect of the plaintiffs' claim.  (Docket No. 34 at 20.)

In response, the plaintiffs argue, in essence, that the undisputed facts and the video speak for themselves.  (Docket No. 41 Ex. 1 at 6-9.)  That is, Trey Hollis was simply trying to leave the restaurant, he displayed no indicia that he was in a gang, officer Southerland stamped on his foot, and then officer Estes grabbed him and threw him on top of the table.  (*Id.*)  Moreover, while the defendants can now offer *post-hoc* rationalizations about supposedly threatening conduct, there was no reasonable basis to feel threatened by Hollis (who was simply trying to leave), and the officers' cursing and nasty comments to Hollis during the events suggest that the officers were motivated by frustration and malice, rather than a reasonable interest in officer safety and containing a "mob scene."  (*Id.*)

As noted above, the video does not provide strong support for the defendants' argument that Estes slipped while trying to restrain the plaintiff up against a wall.  It simply appears from the video that Estes grabbed the plaintiff and threw him up on top of the table.  (Docket No. 40.)  Therefore, a reasonable jury could conclude that the force used here did not occur by accident.  There is also clearly a genuinely disputed issue of material fact as to whether the force used was "objectively reasonable."  While the defendants maintain that the force used against Hollis was "reasonable" in light of his "threatening" behavior, from the video and the record, there is a reasonably strong indication that the defendants were simply annoyed that Hollis had "stood up" to them and, therefore, they "acted out" against Hollis.  The fact that the defendants do not dispute that they addressed Hollis with remarkably profane and aggressive language strongly supports this view.

Moreover, a reasonable jury could find that the force used here was not *de minimis.*  While the defendants rely heavily on an 11th Circuit case, and the Sixth Circuit recognizes the *de minimis* force exception, case law from the Sixth Circuit "does not require that excessive force claims allege excessive marks or extensive physical damage" or, indeed, any injury at all.  *Massey v. Hess*, 2007 WL 2725890, *10 (E.D. Tenn. Sept. 17, 2007).  Rather, depending on the reasonableness (or lack thereof) of an officer's conduct, uses of force including throwing a suspect down on a couch, striking a suspect once, or wrenching a suspect's finger have all been found to be actionable.  *See Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999); *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996)).  Here, Hollis, who had engaged in no criminal activity, was taken and thrown onto a table.  While he suffered no injury, viewing his status as a teenager simply trying to leave a restaurant, a reasonable jury could find

14

that the force used against him was not *de minimis*.[8]

Finally, "the right to be free from physical force when one is not resisting" is a right that was "clearly established" under Sixth Circuit law by December 13, 2008. *See e.g. Wysong v. City of Heath*, 260 Fed. Appx. 848, 856 (6th Cir. 2008); *Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006). Therefore, the defendants' argument that the right at issue was not clearly established is misplaced. *See Wysong*, 260 Fed. Appx. at 856 (relevant precedent needs to only give "fair warning"that the action in question is unconstitutional). Estes is not entitled to qualified immunity/summary judgment on this aspect of the plaintiffs' claim.

### ii. The car

The defendants point to Allen's expert report as strongly supporting the reasonableness of Estes's actions in placing Trey Hollis up against the car. (Docket No. 34 at 21.) That is, according to Allen, "officers are trained to separate a suspect acting aggressively toward an officer in a crowd from that crowd. Moving Trey Hollis outside the restaurant served to de-escalate the situation." (*Id.*) The defendants also point to Allen's opinion that officers are trained to handcuff a suspect up against "an immovable object" to more easily control the suspect. (*Id*; Docket No. 31 Ex. 1 at 11-12.) While Trey Hollis claims that he was "slammed" into the back car window, Allen and the defendants maintain that, if the force used had been

---

[8]The defendants, citing three cases, maintain that "every district court" in Tennessee has followed the Eleventh Circuit and *Nolin*. (Docket No. 34 at 14.) While these cases do indicate that courts in Tennessee apply the *de minimis* force doctrine, they are so readily distinguishable on their facts as to be of little guidance. *See Murray v. Metro Gov't of Nashville and Davidson County*, 2007 WL 1521004, *6 (M.D. Tenn. May 21, 2007)(officers made no physical contact with plaintiffs); *Massey*, 2007 WL 2725890 at *10 (force at issue was a single "grab" at clothing); *Deberry v. Bd. of Education of the Henderson County Schools*, 2005 WL 2175434, *4 (W.D. Tenn. Sept. 2, 2005)(teacher dragged chronically disobedient student from his chair into the hallway)).

unreasonable, more damage to the car and injury to Hollis would have resulted. (*Id.*)

Again, the defendants also argue that the force used was *de minimis* under *Nolin* and they again point to the fact that Hollis did not sustain a significant injury despite being "slammed" on the police car. (Docket No. 34 at 21.) And again, the defendants maintain that, even if the force used violated a constitutional right, "no case law with a similar factual situation has found the officer's conduct to violate the Fourth Amendment," and, therefore, the right at issue was not clearly established.[9] (*Id.* at 22.)

In response, the plaintiffs argue that there is a disputed issue of material fact as to the force that was used, and there is little in the record to refute Trey Hollis's version of events – that is, that his head was "slammed" against the car window. (Docket No. 41 Ex. 1 at 2.) Given that Hollis had committed no crime and was not resisting, the plaintiffs argue, this use of force was clearly unreasonable and violated the plaintiff's constitutional rights. (*Id.* at 3.)

Again, the defendants' arguments are unpersuasive. First, there is a clear genuinely disputed issue of material fact as to the amount of force used against Hollis. Hollis claims that

---

[9]The defendants argue that one of the leading Supreme Court qualified immunity cases, *Saucier v. Katz*, "establishes the application of qualified immunity in a factually similar situation." (Docket No. 34 at 22.) In *Saucier*, the plaintiff claimed that the defendant, who was a military police officer protecting Vice President Al Gore, used excessive force when he shoved the plaintiff, who was protesting Mr. Gore's speech and had been advancing toward the vice-president, into a police van. 533 U.S. at 198. In finding that the defendant was entitled to qualified immunity, the Court focused on, among other things, the shove as being dictated by a sense of urgency to protect the vice-president. *Id.* at 209. The defendants argue that a similar sense of urgency was required here, and, to the extent that Hollis was mishandled during the process of his removal from the crowd, this can be excused by the urgency required. (Docket No. 34 at 22.) *Saucier* is clearly factually distinguishable. Moreover, *Saucier* explicitly stands for the proposition that police officer force, including pushes and shoves, can be actionable, but the court must carefully review all of the facts and circumstances before rendering a conclusion on the reasonableness of the officer's conduct. 533 U.S. at 209.

he was gratuitously slammed against the back window; the defendants claim that, while his head hit the back window, it did not hit the window very hard and the police were justified in moving Hollis quickly and aggressively. This is a classic disputed issue of material fact.

And again, there is sufficient evidence in the record to support the plaintiffs' view that the force used was more extensive than the defendants claim and unreasonable. The defendants concede that they addressed Hollis with belittling profanity, and the video shows the defendants treating Hollis roughly, with no apparent regard for his safety or with any sense of "urgency" to move Hollis to a safe area. From viewing the way Hollis was treated on the video, it is entirely plausible that the first few seconds after Hollis left the restaurant involved Hollis being unnecessarily "slammed" against the window of the police car.

Moreover, the defendants' argument that Hollis would have been hurt more or the police car would have been more damaged if the force had been excessive misunderstands Sixth Circuit "excessive force" case law. Again, a showing of excessive force does not require injury or property damage; it merely requires a showing that the force used was "objectively unreasonable," and, here, given that Hollis was not resisting and had committed no crime, the action of slamming his head against a car window, even if it caused no significant injury or damage, could be viewed by a reasonable jury as excessive and, consistent with the discussion above, not *de minimis*.[10] Therefore, defendant Estes is not entitled to qualified immunity/summary judgment on this aspect of the plaintiffs' claims.

---

[10] Again, because "the right to be free from physical force when one is not resisting" is a right that was "clearly established" under Sixth Circuit law by December 13, 2008, defendant Estes is not entitled to qualified immunity based upon the "clearly established" element of the test.

### iii.    The handcuffing

The Sixth Circuit has found that "the Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Celender*, 583 F.3d 394, 401 (6th Cir. 2009)).  In order for a "handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Id.* (internal quotation omitted).

The defendants maintain that this claim fails because Hollis did not tell the officers that the handcuffs were too tight and because, again relying on 11th Circuit case law, the injury was *de minimis*.[11]  (Docket No. 34 at 23.)  In response, the plaintiffs argue that Hollis did indicate that the handcuffs hurt by making pain sounds.[12]  (Docket No. 41 Ex. 1 at 3.)  Moreover, while the injury may not have been severe, there is no dispute that Trey Hollis's wrists were swollen and painful for some time after the handcuffs were removed, which constitutes "some physical

---

[11]The law on this point was "clearly established" at the time of the incident.  *See Morrison*, 583 F.3d at 401 (finding that the right to be free from tight or excessively forceful handcuffing was clearly established by 2002)).

[12]The defendants argue that the court should not credit Hollis's affidavit statement in which he states that he made "pain sounds" because it is inconsistent with his deposition testimony.  (Docket No. 47 at 3.)  In his deposition, Hollis testified that he did not tell the officers that the handcuffs were too tight and did not say anything about the handcuffs while he was sitting on the sidewalk because the officers were "nowhere to be found."  (Docket No. 27 Ex. 2 at 145-46.)  The court does not view this as a fatal inconsistency.  In the deposition, Hollis testified that, once the officers placed him on the sidewalk, he did not say anything about the handcuffs because the officers had left him on the sidewalk.  (*Id.*)  It is still entirely plausible that Hollis made pain sounds as the handcuffs were being applied, which should have notified a reasonably attentive officer that the handcuffs were too tight.  (Docket 41 Ex. 6 at 2.)

injury." (*Id.* at 3-4.)

A fair reading of *Morrison* dictates that this claim should be allowed to proceed to trial. Neither party has put forth case law indicating what level of verbal indication the plaintiff must provide to indicate that the handcuffs are too tight. However, there is no explicit requirement under *Morrison* that the plaintiff explain his discomfort in a precise way, only that there be sufficient expression to alert the officer. 583 F.3d at 401. While Hollis may not have explicitly said "these handcuffs are too tight, please help me," there is nothing to refute his claims that he did make noises clearly indicating that the handcuffs were hurting him. Under the circumstances of this case, where the officers were treating Hollis in a hostile and inattentive manner, the plaintiff's "pain sounds" constitute a sufficient complaint.

Also, *Morrison* does not require a significant physical injury to survive summary judgment. Indeed, in *Morrison*, the court commented that evidence of painful and numb wrists as the result of too tight handcuffing is the type of injury that is sufficient to survive summary judgment on this type of claim, even if the pain does not persist. 583 F.3d at 402. Here, the plaintiff has stated that he suffered swollen and painful wrists, with pain that persisted for a few days. (Docket No. 41 Ex. 6 at 4.) Under *Morrison*, this is sufficient physical injury to state a viable "handcuffing" claim. Therefore, the defendants are not entitled to summary judgment/qualified immunity on this aspect of the plaintiffs' claims.

### iv.     Britanie Hollis – the shove

The defendants maintain that officer Southerland used reasonable force in shoving Britanie Hollis away from the struggle between the officers and Trey Hollis. (Docket No. 34 at 24.) They again point to Allen's report for the proposition that "it is appropriate and accepted

police practice for a cover officer [Southerland] to use some degree of force against an individual attempting to interfere with a contact officer's [Estes's] efforts to control a suspect. It is also appropriate for a cover officer to remove someone standing between him and the contact officer." (*Id.*) Given that Britanie Hollis was attempting to get between Estes and Trey Hollis, the defendants maintain it was appropriate for Southerland to push her out of the way. (*Id.*)

Also, once again, the defendants cite the lack of injury and the "minimal amount of force" used to claim that the force was *de minimis.* (*Id.* at 25.) Finally, the defendants maintain that Southerland is entitled to qualified immunity because "no case law supports the proposition that pushing someone to the side in order to prevent her from being in the line between contact and cover officers or to prevent her from interfering with the restraint of another person is clearly unlawful." (*Id.* at 25.)

The plaintiffs again argue that the video speaks for itself. (Docket No. 41 Ex. 1 at 5.) That is, the video indicates that Britanie Hollis, a petite 14-year-old, was merely trying to aid her brother who was being assaulted by police, and, in response, a much larger and much older police officer aggressively flung her across the room, before turning back to Trey Hollis. (*Id.*) There is no indication that Britanie Hollis was grabbing for an officer's weapon or was armed herself; rather, she was simply "in the way" and the police officers responded with unreasonable force against her. (*Id.*)

The case law discussed above directs that the court is to evaluate each use of force under the unique circumstances of the case. Certainly, if officer Southerland had pushed an aggressive, adult male out of the way in order to contain a violent suspect, the court would have no difficulty concluding that no constitutional violation occurred. However, while the force used was not

great here, the circumstances are such that, while the question is close, a reasonable jury could find that officer Southerland used, in a gratuitous manner, excessive force and violated Britanie Hollis's constitutional rights.

That is, a reasonable jury viewing the videotape could conclude that Britanie Hollis was a child who posed no threat to officer safety and, if anything, was simply making the officers' job slightly more difficult as she tried to defend her brother. In response, Southerland does not appear to stop and strongly caution Britanie Hollis to get back or pick her up and place her elsewhere, rather he, seemingly violently, flung here across the room. (Docket No. 40.) While this was the only force used against Britanie Hollis and she sustained no physical injury, the court is confident that a reasonable jury could find that the force used against her was excessive and gratuitous, not *de minimis*. Therefore, officer Southerland is not entitled to summary judgment/qualified immunity. *Robert v. Manigold*, 240 Fed. Appx. 675, 678 (6th Cir. 2007)(use of "unnecessary and gratuitous" force violates clearly established rights).

**C      The Seizure[13]**

The protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002); *see Terry v. Ohio*, 392 U.S. 1, 9 (1968). The constitutionality of such an investigatory stop (also known as a *Terry* stop) is evaluated under a two-part analysis. *U.S. v. Smith*, 594 F.3d 530, 536-37 (6th Cir. 2010). First, the court must determine if there was a "reasonable basis" for the stop,

---

[13]In passing, the defendants suggest that the plaintiffs did not properly plead an improper seizure claim. (Docket No. 34 at 23.). In the Complaint, the plaintiffs recited the relevant facts and asserted, under Section 1983, that there had been an "unlawful seizing." (Docket No. 1 at 6.) The court, therefore, construes the Complaint to allege a Fourth Amendment claim for improper seizure.

and, second, the court must determine if "the degree of intrusion" caused by the stop was "reasonably related in scope to the situation at hand."  *Id.*  (internal quotation omitted).

On the first, reasonable basis prong, an officer has a "reasonable basis" for a stop and brief detention when the "officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity."  *Id.* (internal quotation omitted).  A reasonable suspicion is somewhere between a "mere hunch" and the probable cause required to make an arrest.  *U.S. v. Guajardo*, 2010 WL 3069605, *5 (6th Cir. Aug. 5, 2010).

On the second, degree of intrusion prong, "the stop must last no longer than is necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.* (internal quotation and citation omitted).   Both prongs of the analysis are fact-intensive, and the officer's conduct is evaluated based on the "totality of the circumstances."  *See Arvizu*, 534 U.S. at 273.

The defendants argue that Estes merely "temporarily detained Trey Hollis because he reasonably believed [Hollis] was about to physically assault Officer Southerland."  (Docket No. 34 at 23.)  Therefore, Estes, out of a "need to gain control" and to protect "officer safety," detained Hollis until the crowd could be cleared, which occurred in 15-20 minutes.  (*Id.* at 23-24.)

The plaintiffs respond that there was no "reasonable suspicion" here, as Hollis "never reached for any officers' gun or weapon.  He did not have a weapon.  He did not grab at any police officer.  He did not motion or move toward any officer.  Instead the officer came through the door from outside and ran into him.  He did not make any kind of physical motion at any

police officer.  He did not hit or threaten any officer or anybody."  (Docket No. 41 Ex. 1 at 8, 10-11.)

The defendants are, again, not entitled to summary judgment/qualified immunity on the "unreasonable seizure" aspect of the plaintiffs' claim.  A reasonable jury could conclude, based upon the discussion above, that there was no "reasonable basis" to believe that Hollis was about to engage in criminal activity.  Indeed, while a jury could accept the defendants' *post-hoc* explanation that Hollis was moving "aggressively" toward them, that same jury could just as easily believe that Hollis was simply moving out of the restaurant and was trying to leave when the defendants improperly singled him out for rough treatment because he paused to express dissatisfaction with officer Southerland stomping on his foot.  If the jury accepts this, entirely plausible, latter version of events, there was no reasonable basis to seize Hollis at all, let alone leave him sitting on the curb in handcuffs for 15-20 minutes.  If the jury accepted the defendants' version of events, then the defendants' decision to move Hollis outside and let him "cool off" while the defendants controlled the rest of the scene appears reasonable.  Again, this is a genuine dispute over material fact and summary judgment/qualified immunity is not appropriate.[14]

## D.    State Law Claims

The only remaining state law claim that the plaintiffs attempt to defend on summary judgment is intentional infliction of emotional distress (IIED).  (Docket No. 41 Ex. 1 at 13-15.)  A requirement of any IIED claim is that the plaintiff establish "serious mental injury" as the result of intentional, outrageous conduct.  *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).  As discussed above, the plaintiffs claim that they are bothered or embarrassed by the events of

---

[14]The defendants do not dispute that the strictures of *Terry* were "clearly established."

December 13, 2008, but they do not raise a genuine of issue of material fact as to whether they have suffered "serious mental injury." Therefore, the plaintiffs' IIED claims will be dismissed.

## CONCLUSION

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be, in large part, denied, and the other pending motions will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

.